# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF DELAWARE

DAVID E. JONES,          )
          Plaintiff, )
                   )
              v.  )         CA No. 07-743(MPT)
                   )
UNITED STATES OF AMERICA, )
         Defendant.  )

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION
## TO  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Maryanne T. Donaghy, Esq. #4213
Thomas J. Reid, Esq. *Pro hac vice*
Delaware Volunteer Legal Services, Inc.
PO Box 7306
Wilmington, DE 19803
(302) 478-8680
Attorney for Plaintiff

Dated:  August 12, 2008

1

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................ 2

TABLE OF AUTHORITIES...................................................................................... 3

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS.......... 5

SUMMARY OF ARGUMENT................................................................................... 6

STATEMENT OF FACTS……………………………………………………………. 7

ARGUMENT......................................................................................................…… 12

   I. Jones Timely Filed A Claim With The Veteran's Administration ............... 12

   II. In Any Event, The Statute of Limitations Should Be Equitably Tolled......... 16

CONCLUSION........................................................................................................... 22

## TABLE OF AUTHORITIES

### CASES

Bailey v. West, 160 F.3d 1360 (Fed. Cir. 1998)..........................................   16,17,18

Bartus v. United States, 930 F.Supp. 679 (1999)…………………………   16,19,20

Blue v. United States, 567 F. Supp. 394 (D. Conn. 1983)..........................   6,14

Bradford Hospital v. United States, 108 F.Supp.2d 473, 487 (W.D.Pa. 2000)   19

Glarner v. United States, 30 F.3d 697 (6th Cir. 1994).................................…   6,15,19

Hedges v. United States, 404 F.3d 744, 750 (3rd Cir. 2005)………………   16,19,20

Hughes v.United States,  263 F.3d 272  (3d Cir. 2001)...............................   16

Irwin v. Department of Veterans Affairs, 498 U.S. 89 (1990).....................   16

Jackson v. United States, 488 F.Supp. 2d 191 (N.D.N.Y 2007.)………….   19,20

Oropallo v. United States, 994 F.2d 25, 29 n.4 (1st Cir. 1993)……………   16

Perez v. United States, 167 F.3d 913 (5th Cir. 1999) ................................   19

Schmidt v. United States, 933 F.2d 639, 640 (8th Cir. 1991)……………..   16

Yates v. United States, 2008 U.S. Dist. Lexis 40830 at 4 (E.D.Pa. May 20, 2008)   15

## STATUTES

28 U.S. C. § 2401(b)......................................................................... 2, 12

38 U.S.C. Section 1151…………………………………………………… 9

## REGULATIONS

28 C.F.R. Section 14  ………………………………………………….....12

28 C.F.R. § 14.2. ........................................................................12

38 C.F.R. Section 3.103………………………………………………….14,16,17

38 C.F.R. § 14.600.......................................................................... 12

38 C.F.R. § 14.601.......................................................................... 14

38 C.F.R. §14.604.......................................................................... 12, 13, 14, 15, 17

38 C.F.R. Section 14.628-629 ………………………………………….. 8

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff joins Defendant's Statement of the Nature and Stage of the Proceedings

## SUMMARY OF ARGUMENT

I.    Plaintiff David Jones, a Korean War Veteran who was the victim of medical malpractice at the Veterams Administration Medical Center in Wilmington ("VAMC"), timely and adequately filed a claim on or about March 13, 2000 when he presented written notice to the Veterans Administration that he wished to pursue a claim for complications from an operation received at the VAMC for a hernia repair. See Blue v. United States, 567 F. Supp. 394 (D. Conn. 1983.)

II.   Even if Mr. Jones' March 13, 2000 did not constitute a claim, the statute of limitations should be equitably tolled because the Veterans' Administration failed in its regulatory duties to provide Mr. Jones with the correct form, and appropriately assist Mr. Jones through the claims process.   Glarner v. United States, 30 F.3d 697 (6th Cir. 1994.)

.

## STATEMENT OF FACTS

David Jones is a Korean War veteran. Mr. Jones' identity with his service and the country's military remains strong and he has placed his trust in the Veterans' Administration ("VA") and medical services offered to veterans at the VA hospitals for medical care. (A-125.) [1]

In 1999, Mr. Jones was evaluated for a sore hernia at the Wilmington VA Medical Center. Surgery was recommended, and in January, 2000, he underwent surgery for what typically is a fairly routine procedure to have his hernia repaired. However, somehow during the procedure, medical personnel at the VA messed up and created a gastrocolic fusion, ie., attached his small intestine to his stomach. (A-132.) Within two days of the surgery Mr. Jones was rushed to the hospital, vomiting feces, and in such a condition that his children were called to his bedside as hospital personnel did not think he would pull through. (A-117,121.) Mr. Jones made it through albeit requiring two additional surgeries for infections and other complications, also which could have been avoided had adequate medical care been delivered. See Complaint. Jones drove a truck for a living, which included lifting and hours behind the wheel. Since his operations, he can no longer work as he can't wear a seat belt, has trouble handling the normal movement from truck driving, can't lift, and has trouble with his bowels. In short, his life has changed. (A-85,118.)

Almost immediately, Mr. Jones sought assistance in pursuing a claim for compensation from the injuries he sustained as a result of the operation. (A- 6,8,9.) Over eight years later, Mr. Jones continues to be victimized by a process rife with bureaucratic legalese, and a fundamental failure within the system to step back, take a substantive look at what happened here, and help

---

[1] Plaintiff has filed an Appendix to supplement the Appendix filed by defendant. For ease of reference, plaintiff has numbered his Appendix consecutive to defendant's, i.e., defendant's Appendix ends at A-92; plaintiff's Appendix begins at A-93.

this Veteran navigate his rights. This has happened despite that at its most basic, this case was not complicated.

In March, 2000, within weeks of his second operation, Mr. Jones went to the Vietnam Veterans of America (the "VVA") regarding his claim. (A-6,8,9) The VVA is an organization which received its charter from the U.S. Congress. It is expressly recognized and advertised by the VA as an organization whose purpose is to assist Veterans in pursuing their rights. On the VA website, and in publications, the VVA is listed as a resource for veterans in the VA's directory of Veterans Service Organizations. The VA describes organizations like the VVA as "chartered" organizations "which means they are federally chartered and/or recognized or approved by the VA Secretary for purposes of preparation, presentation, and prosecution of claims under laws administered by the Department of Veterans Affairs." (A-93.) VA regulations expressly provide for certification by the Secretary of service organizations and regulate the quality of the representation. See 38 C.F.R. Section 14.628-629. In addition to the website, the VA copied the VVA on correspondence with Mr. Jones (A-19, 20, 21, 22, 31 ) and at times, noted that he could consult with a service organization (i.e., the VVA.) (A-22,96.) In one notice, the VA clearly laid out the ability of a veteran to consult a service organization for assistance with his claim and also noted the ability to hire an attorney. The letter, however, also points out that a service organization is free, and that an attorney will charge, and set forth the regulatory requirements which an attorney needed to follow in order to assist a claimant. (A-55.)[2]

In March 2000, within two days of Mr. Jones visiting the VVA, the VVA sent a letter requesting assistance from the VA and stating that Mr. Jones wanted to make a claim "for

---

[2] Given the expense of hiring an attorney for this type claim, the regulatory limitations then in place for what an attorney can charge, and the VA's systematic and encouraged use of certified Service Organizations, it is unfair and misplaced to now chide the plaintiff for failing to hire an attorney, as the government does in its brief.

8

complications from operation received at Wilmington VA Hospital for hernia operation, and scars." (A- 8, 9).  The VA responded by sending Form 21-526 to Mr. Jones and instructing him to complete the form. (A- 10 ) Neither the VA nor any representative at the VVA told Mr. Jones that he had two possible avenues to seek compensation, i.e., through an administrative grant of disability benefits pursuant to 38 U.S.C. Section 1151, and also through a cause of action against the United States under the Federal Tort Claims Act.  Further, the VA forwarded only Form 21-526 to Mr. Jones in order to make his claim and neither then, nor anytime since, have they forwarded Form 95, which is the form recognized by the VA to start a claim under the FTCA.

Mr. Jones completed Form 526 and the VVA submitted it to the VA on December 18, 2000, well within the two year period, and well within the year period which the government requested the information. (A-13,17.)  After that began a dizzying flurry of correspondence comprised of boilerplate VA letters to Mr. Jones requesting information.  In what can only be described as bureaucratic *chutzpah*, the government's brief characterizes plaintiff's actions during this time period as being dilatory and infers that he did something wrong. To the contrary, plaintiff, with the assistance of his daughter, kept an active interest, made periodic calls, and took numerous steps to provide the information they thought was being asked of them, including a tremendous amount of time in gathering information regarding Mr. Jones' prior marriages, to the point of obtaining a picture of the grave of a former wife. (A-99-110; see also A-140 which was attached to plaintiff's responses to defendant's interrogatories and sets forth contact with the VVA.) The efforts of the plaintiff were patently reasonable, particularly given the VA's initial instruction that their efforts would "take a long time" and that "we know this is a long time to wait for an answer." (A-19.) Further, while faulting Mr. Jones for not providing the

9

information, the government still is not clear about exactly what it is that Mr. Jones was supposed to submit. Many VA letters indicate that they required additional information about his "disability" without being at all clear exactly what information was required. The VA had all of the medical records, and informed Mr. Jones that they would arrange a medical examination if needed. (A-19.) They knew that he was not employed, and that he was claiming for total disability. The confusion is clear in a letter which the VVA sent to the VA following their requests regarding the disability. In the letter, the VVA *expressly* points out to language in Form 21-526 ("Mr. Jones has answered your request for information in question #17, page 7 of the document") which reiterated that he was claiming compensation for complications received from the operation. (A-24.) The VA never specified exactly what information they sought. If they needed to establish Mr. Jones' current medical situation, they could have scheduled a medical exam as was their duty to do so, and as they assured Mr. Jones they would do if needed. (A-19.) Instead, two years later, in a review which epitomized form over substance, the VA Mr. Jones' initial claim because his claims "were not service connected" (Mr. Jones never claimed that he suffered his injuries in Korea) and that there was "no diagnosis." A-119, 120. Again, even following this denial, Mr. Jones was left to try to understand what went wrong. In response to the denial, plaintiff's daughter vainly gathered additional records of his ER visit, including an ambulance record. (A-109, 110.) Shortly after this, Mr. Jones was referred to the Veterans Assistance Program at Widener Law School and, almost immediately after meeting with Professor Reid, Form SF 95 was filed on his behalf and steps were taken to remedy the botched administrative process.[3]

---

[3] Following protracted proceedings Mr. Jones has since been granted a 60% disability amount following a finding of lack of due care by the VA. (A-85, 86.) His appeal to increase the rate to 100% is pending.

Throughout Mr. Jones' protracted claims process, it had to have been apparent to the VA that this was a claim for medical negligence. As it is required to do by regulation, the VA obtained Mr. Jones' medical records. Even the most cursory review of what happened to Mr. Jones *per se* indicated possible negligence. In addition, an adequate review of the medical records would have shown many critical medical records missing. There existed no written informed consent for the operations. There is no documentation that anyone spoke to him about the risks and benefits or obtained his consent to perform the procedure. (Mr. Jones cannot read and personnel at the VA knew this.) Further, there are no notes of the operation. [4] (A-132.) In short, even if the indication that Mr. Jones' injury stemmed from "complications from operation received at Wilmington VA Hospital for hernia operation, and scars" was not enough to alert VA personnel that a Form 95 should be sent, certainly as the medical records were reviewed, and the facts of what happened became apparent, someone at the VA should have looked at this file with more than just an eye to check boxes. In short, the system failed Mr. Jones and should not now be permitted to use that failure to avoid suit.

---

[4] Mr. Jones has also been unsuccessful in obtaining "Quality Assurance" documents from the VA, which may better explain what happened. By regulation, the VA is required to investigate events such as this. Once Mr. Jones was in touch with the Widener Vets Clinic, through Professor Reid, multiple requests for these documents were made. The VA rejected the requests, and the parties disagree on the legal basis which the VA cites as support for withholding the documents. (A-187)

11

**ARGUMENT**

## I. PLAINTIFF TIMELY FILED A CLAIM WITH THE VETERANS ADMINISTRATION

The government's brief incorrectly suggests that there is no dispute that a claim was filed. However, a reading of the relevant regulations and case law suggest that Mr. Jones properly filed a claim sufficient to meet the regulatory prerequisites well within the statutory period.

A Federal Torts Claims Act claim against the VA for medical malpractice must be commenced within two years from the date that the claim accrues.

> (b) a[A] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim *accrues* or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented. (emphasis added)

28 U.S. Code § 2401(b).

28 C.F.R. § 14.2 provides as follows.

(a) For purposes of the provisions of 28 U.S.C. §§ 2401(b)2672, and 2675, a claim shall be deemed to have been presented when a Federal agency receives from a claimant, his duly authorized agent or legal representative, an executed Standard Form 95 *or other written notification of an incident*, accompanied by a claim for money damages in a sum certain for injury to or death alleged to have occurred by reason of the incident; and the title or legal capacity of the person signing, and is accompanied by evidence of his authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian, or other representative.

(Emphasis added.)

Regulations for the VA supplement the regulations for the Federal Tort Claims Act promulgated at 28 C.F.R. Section 14. 38 C.F.R. Section 14.600(b). 38 C.F.R. § 14.604 provides as follows.

(a) Each person who inquires as to the procedure for filing a claim against the United States, predicated on a negligent or wrongful act or omission of an employee of the Department of Veterans Affairs acting within the scope of his or her employment, *will be furnished a copy of SF 95, Claim for Damage, Injury, or Death.* The claimant will be advised to submit the executed claim directly to the Regional Counsel having jurisdiction of the area wherein the occurrence complained of took place. He or she will also be advised to submit the information prescribed by 28 CFR 14.4 to the extent applicable. If a claim is presented to the Department of Veterans Affairs which involves the actions of employees or officers of other agencies, it will be forwarded to the Department of Veterans Affairs General Counsel, for appropriate action in accord with 28 CFR 14.2.

(b) A claim shall be deemed to have been presented when the Department of Veterans Affairs receives from a claimant, his or her duly authorized agent or legal representative, an executed SF 95, *or other written notification of an incident,* together with a claim for money damages, in a sum certain, for damage to or loss of property or personal injury or death: Provided, however, That before compromising or settling any claim, an executed SF 95 shall be obtained from the claimant.

(c) A claim presented in compliance with paragraphs (a) and (b) of this section *may be amended* by the claimant at any time prior to final Department of Veterans Affairs action or prior to the exercise of the claimant's option under 28 U.S.C. 2675(a). Amendments shall be submitted in writing and signed by the claimant or his or her duly authorized agent or legal representative. Upon the timely filing of an amendment to a pending claim, the Department of Veterans Affairs shall have 6 months in which to make a final disposition of the claim as amended and the claimant's option under 28 U.S.C. 2675(a) shall not accrue until 6 months after the filing of the amendment see § 14.600(b)(1).

(Emphasis added.)

Within two months of the botched operation, and only weeks following his second operation, Mr. Jones went to the VVA for assistance. Almost immediately, on March 13, 2000, the VVA sent a letter to the VA Regional Office requesting assistance stating that Jones intended to open a claim for "service-connected disability from complications from operation received at Wilmington VA Hospital for hernia operation, and scars." (A-9)  The VA responded to this letter by instructing that a Form 21-256 be completed, which Mr. Jones did, again stating that his injuries were caused by complications from his operation. (A-10, 13-17.) The form was received by the VA well before expiration of any statute of limitations, well before the agency's own request that it be received within one year, and with full and sufficient information for the agency to begin to investigate the claim. Contrary to its own regulations, the VA never provided Form A-95 nor communicated in any way that one was required. 38 C.F.R. Section 14.604. Nor did the VVA, a service organization certified by the VA and relied up by Mr. Jones. The Regional Office never forwarded Jones' compensation claim or a copy of it to the Office of Regional Counsel. 38 C.F.R. Section 14.601(2)(i) The Regional Office denied Jones' claim on March 18, 2002 purporting that the denial was because Mr. Jones' injuries were not service connected (he never claimed that he incurred the injuries in Korea) and that no disability had been established, despite that the VA had the ability and duty to investigate and establish whatever facts they deemed were missing. (A-18, 30-34). See also 38 C.F.R. 3.103 (a.) After submitting additional information, and no agency action in the meantime, Mr. Jones contacted the Veterans Law Clinic at Widener University and engaged counsel through that program. Almost immediately, on May 30,

2003, a Form 95 was submitted and action was taken to re-open his administrative claims

which resulted in a finding of fault on the part of the VA and a grant of 60% disability.

(A-79 – 86.)

The letter sent to the VA in March, 2000, was sufficient to constitute a "writing"

and, while not expressly containing a sum certain, satisfied the critical requirements of

38 C.F.R. § 14.604(b), as did the subsequent form 526 (A 13-17, 25-29), also submitted

to the VA. The claims were dated, signed, and identified the precise reason for which

Mr. Jones sought compensation: complications from a hernia repair operation at a VA

hospital. Blue v. United States, 567 F. Supp. 394 (D. Conn. 1983) is directly on point.

In that case, a prison inmate injured in a fire at a federal prison, did not submit a formal

administrative claim. The Court held that a written claim presented to the Agency was

adequately "presented" despite not having a sum certain, particularly given that the

government had the facts necessary to establish the claim. Blue at 9. Similarly, the

government in this case had the Veteran's medical record, and could establish the facts

giving rise to Mr. Jones' claim. Also like the plaintiff in Blue, the damages for pain and

suffering suffered by Mr. Jones are intangible, and less susceptible to precise calculation

of a sum certain. See Blue at 13 (because damages not easy to calculate, no prejudice to

the government for failing to specify a sum certain.) Further, the regulations expressly

permit amendment. Mr. Jones filed Form 95 in 2003, including a sum certain. 38 C.F.R.

§ 14.604 ( c). See also Yates v. United States, 2008 U.S. Dist. Lexis 40830 at 4 (E.D.Pa.

May 20, 2008) (following Blue, written claim presentment by an inmate sufficient despite

not having "sum certain"; injuries are intangible and the government was aware of the

claims.) Both Blue and Yates are cases that involve inmates. In both opinions, the Court

notes the special relationship between the government and that class of individuals. While clearly of a different kind, the government also has a special relationship with Veterans which warrant the same type of analysis that the <u>Blue</u> and <u>Yates</u> Courts undertook in deciding that the claimant had properly filed a written claim with the statutory period. For these reasons, the March 2000 letter, as well as the subsequent Form 526s sufficiently complied with the statute requiring that a claim be sent to the VA within two years. <u>But</u> <u>see</u> <u>Glarner v. United States</u>, 30 F.3d 697 (6th Cir. 1994) (Form 21-526 does not constitute notice of a claim under 28 U.S.C. § 1346 and 28 C.F.R. § 14.2 because it does not contain a "sum certain.")

## II. THE STATUE OF LIMITATIONS SHOULD BE EQUITABLY TOLLED

Even if Jones' original writings to the VA were not "claims" sufficient to trigger a filing, this is a clear case where the statute should be equitably tolled.

The United States is subject to equitable tolling to the extent that a private defendant would be subject to the same doctrine. <u>Irwin v. Department of Veterans Affairs</u>, 498 U.S. 89, 95-96 (1990). There is a rebuttable presumption of equitable tolling, <u>Irwin</u> at 95, consequently, contrary to the assertions in the government's brief, the burden is on the government. <u>See</u> <u>also</u> <u>Hedges v. United States</u>, 404 F.3d 744, 750 (3rd Cir. 2005) (Defendant bears the burden in a 12(b)(6) motion to show that no claim has been presented.); <u>Hughes v.United States</u>, 263 F.3d 272 , 278 (3d Cir. 2001); <u>Schmidt v. United States</u>, 933 F.2d 639, 640 (8th Cir. 1991) (failure to comply with the statute is "an affirmative defense which the defendant has the burden of proof that the plaintiff knew, or reasonably should have known of the injury complained of" more than two years prior

to the date of filing Form 95.); Oropallo v. United States, 994 F.2d 25, 29 n.4 (1st Cir. 1993).

Equitable tolling is recognized "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." Irwin at 96. Contrary to the government's arguments, this standard does not require nefarious, active, affirmative misconduct. The standard applies if a plaintiff has been "induced" *or* "tricked." Affirmative misconduct is one standard for equitable tolling, but not the only standard. See Bartus v. United States, 930 F.Supp. 679, 682 ("The government misstates the standard. A claimant need not necessarily show affirmative misconduct to avail himself of equitable tolling….")

This standard has been particularly prevalent when Courts have been deciding the application of equitable tolling to the claims of veterans. The regulatory framework of the VA claims process is set up such that the VA is responsible for assisting veterans through the process. 38 C.F.R. Section 3.103 states as follows.

> (a) Statement of policy. Every claimant has the right to written notice of the decision made on his or her claim, the right to a hearing, and the right of representation. Proceedings before VA are ex parte in nature, *and it is the obligation of VA to assist a claimant in developing the facts pertinent to the claim* and to render a decision *which grantes every benefit that can be supported in law* while protecting the interests of the Government.

(Emphasis supplied.) The VA informed Mr. Jones of this during the process. (A94-96.) This policy is entirely consistent with the requirement that the agency affirmatively supply the proper form. 38 C.F.R. Section 14.604(a).

In *Bailey v. West*, 160 F.3d 1360 (Fed. Cir. 1998), the Court authorized the application of the doctrine of equitable tolling to the 120 appeal period from the Board of

Veterans Appeals to the Court of Appeals for Veterans Claims. In that case, the Court

stated:

> Irwin and other cases explain that equitable tolling is available in suits between
> private litigants where, "the claimant has actively pursued his judicial remedies by
> filing a defective pleading during the  statutory period, or where the complainant
> has been induced or tricked by his adversary's misconduct into allowing the filing
> deadline to pass." *Irwin* at 96 (footnotes omitted); see also *Juice Farms, Inc. v.*
> *United States*, 68 F.3d 1344, 1346

> According to allegations in the papers before us, Bailey learned before the time had
> run that he could file a claim with the aid of a Veterans Benefits Counselor, rather
> than an attorney. His reliance on, and faith in what Congress clearly intended to be
> a paternalistic means for addressing veterans' claims, *see, e.g.  Walters v. National*
> *Ass'n of Radiation Survivors*, 473 U.S. 305, 323-24, 87 L. Ed. 2d 220, 105 S. Ct.
> 3180 (1985) (superseded by Veterans Judicial Review Act), presumably lulled him
> into accepting and relying upon the advice and aid of the government. Given the
> particular relationship between veterans and the government, Bailey was misled by
> the conduct of his adversary into allowing the filing deadline to pass

*Bailey*  at 1364-65

The VA owed Jones, a Korean war veteran who had difficulty reading, the duty of

supplying him with the proper form, since he had inquired about making a claim for

disability. It breached that duty. Jones, relied on and trusted the VA and its service

organization, the VVA to take care of his claim. Letters sent throughout that process

lulled Jones into a valid belief that he could rely on the VA and the VVA. (e.g., A-94-96;

93; see also Statement of Facts.)  He exercised due diligence in pursing his negligence

claim against the VA assisted by  his national veterans service officers. The VA has a

special obligation to deal fairly with veterans such as Jones. Instead, the VA breached

that special trust owed to Jones and misled Jones and his veterans service officers,

preventing Jones from filing an appropriate Form 95 within the two year prescribed

period. The VA and the United States cannot now claim that Jones either failed to

18

exercise due diligence or otherwise ought to bear the loss of his claim because he failed to file the right form at the right time.

This case is on all fours with Glarner v. United States, 30 F.3d 697 (6th Cir. 1994.) In Glarner, the Sixth Circuit held that equitable tolling applied when a claimant filed a VA claim under 38 U.S.C. § 1151 for medical malpractice and the VA failed to supply Glarner with a Form 95. Like Mr. Jones, Glarner went to a service organization, the Disabled American Veterans office located in the hospital, and told a national service officer that he believed he was totally disabled as a result of his medical treatment and wanted to file a negligence claim against the hospital. The DAV officer completed a VA Form 21-526 which Glarner signed on November 14, 1989 and which was filed with the Regional Office under 38 U.S.C. § 1151 (negligent medical care). Like Mr. Jones, no one told Glarner that he had separate remedies under § 1151 and the FTCA; he thought he was doing everything necessary to pursue his claim for medical malpractice. His Form 21-526 included the statement "I feel that I am entitled to compensation as a result of this negligence." The Court held that the two year claim bar period was tolled because Glarner was not told that he had to file a Form 95 until May 1992, and he then filed his Form 95 in November 1992.

The facts in this case are even stronger than in Glarner. In Glarner, the plaintiff proactively submitted Form 526, which is a claim for administrative damages. Here, Mr. Jones initiated the notice to the VA by informing them of the complications from the surgery and asking for their assistance. The Agency then provided only one form to Mr. Jones. See also Perez v. United States, 167 F.3d 913 (5th Cir. 1999) (citing Glarner and applying equitable tolling in an FTCA case where an agency failed to follow its own

19

regulations, resulting in the late filing.)  See further  Bradford Hospital v. United States,
108 F.Supp.2d 473, 487 (W.D.Pa. 2000) ("….numerous courts have applied equitable
tolling when the agency's failure to follow its own regulations causes the plaintiff to miss
a statuory or regulatory deadline.")

District Courts have followed Glarner.  The facts in Bartus v. United States, 930
F.Supp. 679 (1999) are also similar to this case.  In Bartus, the plaintiff contacted a VA
benefits counselor who agreed to file the claim on Bartus's behalf, but failed to
differentiate between the plaintiff's claims under the FTCA and his administrative claims.
The Court noted the VA's failure to advise Bartus of his rights to file both types of claims
and holding that "it would be distinctly unfair to allow this bureaucratic snafu to
foreclose plaintiff's claim", held that equitable tolling applied.  Bartus at 682.  See also
Jackson v. United States, 488 F.Supp. 2d 191 (N.D.N.Y 2007.)

The government relies heavily on Hedges v. United States, 404 F.3d 744 (3rd Cir.
2005.)  That case, however, is different as it was decided under the Suits in Admiralty
Act.  Its language and reasoning is informative, however, and supports application of
equitable tolling in this case.  In Hedges, the plaintiff was told to file a Form 95 for a
claim under the FTCA but was not told about the Admiralty Act.  Among other facts, the
Court found it persuasive that (unlike this case), the agency had made a determination, on
the merits, under *both* statutes, despite the lack of filing under the Admiralty Act.
Hedges at 752.   Further, the Third Circuit found it persuasive that the government had no
affirmative duty to assist potential litigants in that case.  Hedges at 752.  In this case, the
Veterans Administration did have a duty to assist, which is precisely the reasoning relied
on in Glarner.  The Hedges Court held that equitable tolling is appropriate (1) where the

defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." Hedges at 751. While meeting one is enough, each of those factors are met here. Mr. Jones was misled by the VA and the VVAs failure to meet their regulatory duties and by virtue of this, he was prevented from asserted his rights. Further, he timely filed a claim within the administrative process. Equitable tolling should be applied in this case, and Mr. Jones' claims allowed to proceed.

## CONCLUSION

For all of these reasons, Plaintiff respectfully requests that the Court deny Defendant's

Motion to Dismiss.

Maryanne T. Donaghy, Esq. #4213
Professor Thomas Reid, *pro hac vice*
Delaware Volunteer Legal Services, Inc.
PO Box 7306
Wilmington, DE 19803
(302) 478-8680
Attorneys for Plaintiff

DATED: Aug 12, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that I have caused a copy of the Plaintiff's Answering Brief In

Opposition To Defendant's Motion for Summary Judgement and Appendix to be served

by electronic mail on Seth M. Beausang, Esq., U.S. Attorney's Office 1007 N. Orange St.

Ste 700 P.O. Box 2046, Wilmington, DE 19889-2046, seth.beausang@usdoj.gov

on  August 12  2008.

23



## VETERANS SERVICE ORGANIZATIONS

### Directory of Veterans Service Organizations

Welcome to the online Directory of Veterans Service Organizations. This is published as an informational service by the Office of the Secretary of Veterans Affairs. This up-to-date, database driven website allows you to View VSO information in a variety of ways. You may also Search through the VSO database to find information that suits your needs. Inclusion of an organization in the directory does not constitute approval or endorsement by VA or the United States Government of the organization or its activities. Some VSOs are "chartered", which means they are federally chartered and/or recognized or approved by the VA Secretary for purposes of preparation, presentation, and prosecution of claims under laws administered by the Department of Veterans Affairs. Inclusion of non-chartered organizations does not constitute or reflect VA recognition of said organization and its representatives for purposes of representation of VA claimants.



For Benefits questions, contact the VA
For web site technical issues, please send your comments to vsoweb@va.gov.

---

Español | VA Forms | Facilities Locator | Contact the VA | Frequently Asked Questions (FAQs)
Privacy Policy | Web Policies & Important Links | Annual Performance and Accountability Report
Freedom of Information Act | Small Business Contacts | Site Map
USA.gov | White House | USA Freedom Corps

Reviewed/Updated Date: January 11, 2007

*A-93*

**DEPARTMENT OF VETERANS AFFAIRS**
**Medical and Regional Office Center**
**1601 Kirkwood Hwy**
**Wilmington DE 19805-4917**

## APR 2 3 2001

DAVID E JONES                          In Reply Refer To:   460/21/atm/110
PO BOX 165                                                  **CSS 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**
DELAWARE CITY DE 19706                                      JONES, David E

Dear Mr. Jones:

On November 9, 2000, The Veterans Claims Assistance Act of 2000 (VCAA) was signed into law. This law establishes new duties for the Department of Veterans Affairs (VA) when you file an application for disability benefits.

The purpose of this letter is to notify you about this new law. We also want you to know that we will help you get evidence to support your recent claim for benefits. In this letter we will tell you what evidence is necessary to establish entitlement, what information or evidence we still need from you, and what you can do to help with your claim. It will also tell you when and where to send the information or evidence, what has been done to help with your claim, and who to call if your have questions or need assistance.

## VA's Duty To Notify You About Your Claim

The VCAA requires us to explain to you what information or evidence we need to grant the benefit you want. We will tell you when medical evidence is required. Medical evidence includes such things as doctors' records, medical diagnoses, and medical opinions.

We will tell you what necessary information or evidence you must give us, such as income information, or the names and addresses of doctors who treated you for your medical condition. We will also tell you what necessary information or evidence we will try to get for you.

## VA's Duty To Assist You Obtain Evidence For Your Claim

The law states that we must make reasonable efforts to help you get evidence necessary to support your claim. We will try to help you get such things as medical records, employment records, or records from other Federal agencies. You must give us enough information about these records so that we can request them from the person or agency who has them. It's still your responsibility to make sure these records are received by us.

We will also assist you by providing a medical examination or getting a medical opinion if we decide it's necessary to make a decision on your claim.

2

CSS 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
Jones, David E

## What Must The Evidence Show To Establish Entitlement?

To establish entitlement for service connected compensation benefits, the evidence must show three things:

- *An injury in military service or a disease that began in or was made worse during military service, or an event in service causing injury or disease.* If we do not yet have them, we will get service medical records and will review them to see if they show you had an injury or disease in service. We will also get other military service records if they are necessary.

OR

For certain conditions, you don't have to show that you had an injury or disease in service. These are called "presumptive conditions." These are medical conditions that were first shown after service, not during service. For most of these conditions, the evidence must show that you were diagnosed with the condition within one year after you left military service. Longer time limits apply for certain other medical conditions.

- *A current physical or mental disability.* This can be shown by medical evidence or other evidence showing you have persistent or recurrent symptoms of disability. We will get any VA medical records or other medical treatment records you tell us about. If necessary, we may schedule a VA examination for you to get this evidence. You may also submit your own statements or statements from other people describing your physical or mental disability symptoms. We will review this evidence to see if it shows you have a current disability or symptoms of a disability.

- *A relationship between your current disability and an injury, disease, or event in service.* This is usually shown by medical records or medical opinions. We will request this medical evidence for you if you tell us about it. If appropriate, we may also try to get this evidence for you by requesting a medical opinion from a VA doctor, or you can give us a medical opinion from your own doctor.

## What Information or Evidence Do We Still Need From You?

We need the following information from you:

- the name of the person, agency, or company who has relevant records;
- the address of this person, agency, or company;
- the approximate time frame covered by the records; and
- the condition for which you were treated, *in the case of medical records.*

We may ask you to sign a release that gives us the authority to request these documents for you. You can get these records yourself and send them to us.

A-95

3

CSS 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
Jones, David E

## What Can You Do To Help With Your Claim?

You can help us with your claim by doing the following:

- tell us about any additional information or evidence that you want us to try to get for you.
- tell us if your address or phone number changes.

## When And Where Do You Send The Information Or Evidence?

Send the information describing additional evidence or the evidence itself to the address at the top of this letter by June 23, 2001. Please put your full name and VA file number on the evidence. If we don't receive the information or evidence within that time, we will decide your claim based only on the evidence we have received and any VA examinations or medical opinions.

If the information or evidence is received within one year from the date of this letter, and we decide that you are entitled to VA benefits, we may be able to pay you from the date we received your claim.

If the evidence isn't received within one year from the date of this letter, and we decide that you are entitled to VA benefits, we can only pay you from the date we receive the evidence.

## Do You Have Questions Or Need Assistance?

If you have questions or need assistance with this claim, please call us at 1-800-827-1000. If you use a Telecommunications Device for the Deaf (TDD), the number is 1-800-829-4833.

If you call please refer to your VA file number 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. If you write to us, please put your full name and VA file number on the letter. You can visit our web site at www.va.gov for more information about veterans' benefits.

You may wish to call your service organization representative, the Vietnam Veterans of America at (302) 633-5357. They have representatives who can assist with your claim

Sincerely yours,

C. T. KEENAN
Service Center Manager

cc:  VVA

93

A-96

**DEPARTMENT OF VETERANS AFFAIRS**
**Medical and Regional Office Center**
**1601 Kirkwood Hwy**
**Wilmington DE  19805-4917**

June 13, 2001

MR. DAVID E. JONES
PO BOX 165
DELAWARE CITY, DE 19706

In Reply Refer To:  460/21/AES
CSS 222 12 4185
JONES, D. E.

Dear Mr. Jones:

This is in reference to your claim for disability due to VA hernia repair on 3-9-01..

We need the following evidence, or information, before we can act on your claim. Submit evidence of current additional disability due to the treatment.

This evidence, or information, should be furnished as soon as possible, preferably within 60 days. The evidence must be received in the Department of Veterans Affairs within one year from the date of this letter; otherwise, if entitlement is established, benefits may not be paid for any period prior to the date evidence is received.

Sincerely yours,

C. T. KEENAN
Service Center Manager

cc:  VVA

jones4185a.doc

94

A-97

1601 KIRKWOOD HGWY
WILMINGTON DE 19805    (RO COPY)    70    July 19, 2001

In Reply Refer To:

DAVID E JONES
PO BOX 165
DELAWARE CITY DE  19706

File Number:
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
PAYEE NO 00
D E JONES

We are working on your claim. However, we need more information before we can finish our action:

A copy of the public record ending your previous marriages, for example, a divorce decree or death certificate.

A copy of the public record ending YOUR SPOUSE'S previous marriages, for example, a divorce decree or death certificate.

Send us a copy of your marriage certificate.

On VA Form 21-686c, please give the full name, date, place of birth, and social security number of each of your children, and the name and address of the person with whom the child lives. For any child not living with you, also provide the monthly amount you contribute to the child's support.

Please send us this evidence as soon as possible, preferably within 60 days. The faster you send us the information we need, the sooner we can work on your claim. We must receive it within one year from the date of this letter. If we do not receive it within one year, we will not be able to pay the benefit you are claiming for any period before the date it is received. Be sure to write the veteran's full name and VA file number on all evidence or forms that you send us.

If your mailing address is different than that shown above, please advise us of your new mailing address. You should notify us immediately of any changes in your mailing address.

IF YOU RESIDE IN THE CONTINENTAL UNITED STATES, ALASKA, HAWAII OR PUERTO RICO, YOU MAY CONTACT VA WITH QUESTIONS AND RECEIVE FREE HELP BY CALLING OUR TOLL-FREE NUMBER 1-800-827-1000 (FOR HEARING IMPAIRED TDD 1-800-829-4833).

C. T. KEENAN
VETERANS SERVICE CENTER MANAGER

ENCL: 21-686C

95



Vietnam Veterans of Ark.
VA Regional Office
1601 Kirkwood Highway
Wilmington, DE 19805

Terry Baker
National Service Representative
633-5357 or
994-2511, ext.357

Gail Rando
VSO

TO: _Adjudication_

FROM: _VVA_

RE: _Jones, David_

C#: _____

SS#: _222 12 4185_ ⌐@ 7-27

DATE: _07/24/2001_

RECEIVED
JUL 2 4 2001
VET SERVICES DIV.
VAMROC 460

**We submit for your consideration, claim for benefits based upon service of the above-named veteran together with supporting evidence as indicated below, for your attention and necessary action.**

- ☐ 1-9
- ☐ 1-646
- ☐ 10-10
- ☐ 10-1394
- ☐ 21-509
- ☐ 21-526
- ☐ 21-527
- ☐ 21-530
- ☐ 21-534
- ☐ 21-535
- ☐ 21-601
- ☐ 21-651
- ☐ 21-686C
- ☐ 21-2680

- ☐ 21-4100
- ☐ 21-4138
- ☐ 21-4502
- ☐ 21-4555
- ☐ 21-6749
- ☐ 21-6875
- ☐ 21-6876
- ☐ 21-6897
- ☐ 21-8416a
- ☐ 22-1900
- ☐ 22-1990
- ☐ 21-22
- ☐ 26-1880
- ☐ 572

- ☒ Marriage Certificate
- ☒ Divorce Decree
- ☒ Death Certificate
- ☐ Birth Certificate
- ☐ DD214
- ☐ Medical Statement
- ☐ Funeral Statement
- ☐ Receipted Statement
- ☐ Notice of Disagreement
- ☒ Supporting letter/photo
- ☐ _____
- ☐ _____
- ☐ _____
- ☐ _____

Remarks: _We're sorry if this information hasn't already been sent. If it has - here is another copy. Thanks! Gail_

96

A-99

June 27, 2001

Re: David E. Jones –Copies of Divorce Decrees and Death Certificates
Previous Spouses

To Whom It May Concern:

As per your request, I am sending you the information you requested on my previous spouses.
The information is as follows:

| NAME | MARRIAGE | DIVORCE | DEATH |
|---|---|---|---|
| Eleanor May Brittingham Jones | 11-14-49 | 01-22-60 | 08-07-73 |
| Beverly Ann Lum Jones | 01-28 -60 | ******** | 06-19-60 (fathers day) |
| Barbara Ann Potts Jones | ? | 09-10-65 | ********** |
| Barbara June Smith Brogan Jones | ? | 04-06-72 (filed 03-06-72) | ********** |
| Kathryn Hall Zimmerman Jones | ? | 06-04-81 (filed 05-14-81) | ********** |
| Jacqueline E Zimmerman Jones | ? | 04-24-90 (filed 04-12-90) | ********** |
| Helyn Marie Ayers Jones | 06-14-96 | ******** | ********** |

Attached are copies of Divorce Decrees, Death Certificates, and a Picture of the Grave marker
for Beverly Ann Lum Jones. We are unable to obtain a copy of her Death Certificate. She died due
to injuries received in an auto accicent. She died in the Elkton Hospital.. Those record are in
Baltimore, Maryland. We have been unable to go to Baltimore. I did visit Mrs. Leona Lum at 2195
Crystal Beach Rd. , Earlville, Maryland. She is the mother of Beverly Ann Lum Jones. She also could
not locate her copy of the Death Certificate. Mrs. Lum is not in good health and is limited to what she
can do. If this was packed away where she could not get to it , she had stated that it would not be
obtainable. She did look for it and sent a note to my daughter Vickie Jones Snyder (attached) stating
that she could not find it. I returned to Maryland to the site of Beverly Ann Lum Jones' grave. On my
first trip neither I nor my Daugher, Vickie, had a camera. So I returned to the grave site again with a
camera and took a picture of her grave marker. This is the only proof I have of her death at this time. I
hope this will be sufficent. If there is anything else needed please let me know. I can be reached at 834-
3269.

Sincerely,

David E. Jones

DEJ:vljs
Attachments:
1 Picture of Grave Marker, 1 Note from Mrs. Lum (410-275-2064)Earlville, Md 21919-1702
5 Divorce Decrees, 1 Death Certificate, 1 Marriage Licence (current spouse)

# CERTIFICATE OF DEATH

## State of Delaware

### DEPARTMENT OF HEALTH AND SOCIAL SERVICES
### DIVISION OF PHYSICAL HEALTH

BUREAU OF
VITAL STATISTICS

2858

LOCAL REG. NO. N 1527    STATE FILE NO.

| | | |
|---|---|---|
| COUNTY New Castle | STATE Delaware | COUNTY N. C. |
| Wilmington Del. | New Castle 19720 | |
| | Castle Hills | |
| The Wilm. Med. Center Del. Div. | 15 Maynard Drive | |

NAME: Elenor N. Alfano    DATE OF DEATH August 5 73

SEX F    COLOR W    MARRIED    OCCUPATION Housewife    USA

DATE OF BIRTH Nov. 7, 1930    AGE 42    BIRTHPLACE Delaware

FATHER John W. Brittingham    MOTHER Esther G. Cox

INFORMANT Mr. Bernard Joseph Alfano (Same)

CAUSE OF DEATH: Carcinoma of left lung    167.1

I CERTIFY THAT I ATTENDED THE DECEASED FROM August 4 73 TO August 5 73

THAT I LAST SAW THE DECEASED ALIVE ON August 5 73 AND DEATH OCCURRED AT 1300 M.

FROM THE CAUSES AND ON THE DATE STATED ABOVE.

PHYSICIAN'S SIGNATURE Fredric M. Davis, M.D.

The Wilmington Med. Center, Inc.

DATE SIGNED August 6, 1973

Burial    August 8, 1973

McCrery Funeral Homes, Inc.    2700 Washington Street Wilm. Del.

Gracelawn Memorial Park

Wilmington, Delaware    AUG 7 1973    Barbara B. Rose M.D.

COPY BY FILM...
ISSUED - WILMINGTON DEL...

JAN 26 2001

DATE

...VITAL STATISTICS
...DIVISION OF PUBLIC HEALTH

A-101

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

# IN AND FOR NEW CASTLE COUNTY

|  |  |  |
|---|---|---|
| **DAVID JONES** | ) | |
| | ) | |
| | ) | |
| **VS.** | ) | **1036  CIVIL ACTION 1959** |
| | ) | |
| **ELEANOR M. JONES** | ) | |
| | ) | |
| | ) | |
| | ) | |

I, Sharon Agnew, Prothonotary of the Superior Court of the State of Delaware, in and for New Castle County, do hereby certify that there is of Record in the Superior Court, New Castle County, a final decree in divorce in the above stated cause, which was granted on **JAN. 22,** A.D., 19**60** by **ALBERT J. STIFTEL,** Judge.

Witness my hand and seal of this Court, this **17TH** day of **APRIL,** A.D., 20**01**.

Sharon Agnew
Prothonotary

*Alice Slaughter*
Per Clerk

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

# IN AND FOR NEW CASTLE COUNTY

David E. Jones )
)
)
VS. )          1234  CIVIL ACTION 1965
)
Barbara A. Jones, aka Barbara )
A. Potts )
)
)

I, Sharon Agnew, Prothonotary of the Superior Court of the State of Delaware, in and for New Castle County, do hereby certify that there is of Record in the Superior Court, New Castle County, a final decree in divorce in the above stated cause, which was granted on **September 10,** A.D., 19**65** by **William J. Storey,** Judge.

Witness my hand and seal of this Court, this **18th** day of **April,** A.D., 20**01**.

Sharon Agnew
Prothonotary

*Marie Q. Caruso*

Per Clerk

100

A-103

Divorce Form No. 2 – March 6, 1972

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

BARBARA J. JONES

vs.

DAVID E. JONES

No. 2482      Civil Action, A. D. 1974

**DIVORCE**

## FINAL DECREE

AND NOW TO-WIT, this        tenth        day of        June

A.D. 1974        , it appearing to the Court that the Decree Nisi in the above stated case was entered

on the        tenth        day of        May        A.D.        1974        ; that thirty

days have expired since the entry of the Decree; that said Decree has not been appealed from, and

that there are no proceedings for review pending and the Court not having otherwise ordered, and

no cause to the contrary having been shown; upon application by the plaintiff

IT IS ORDERED, ADJUDGED AND DECREED that said Decree Nisi be and remain

final and absolute.

**101**

A-104

s/Robert L. ...........
..............................................
Judge



# The Family Court of the State of Delaware

IN RE THE MARRIAGE OF:　　　　　　)　　　NEW CASTLE ; COUNTY

JACQUELINE E. JONES　　　　　　　　)

　　　　　　　　　Petitioner.　　　)

　　　　　　　　　　　　　　　　　　)　　　Petition No. ___003-90___

AND　　　　　　　　　　　　　　　　)

DAVID E. JONES　　　　　　　　　　　)

　　　　　　　　　Respondent.　　　)　　　DIVORCE

## FINAL DECREE

HAVING REVIEWED THE WRITTEN ORDER OF THE Master, evidencing satisfaction of the requirements of the Delaware Divorce and Annulment Act, Title 13, Chapter 15 of the Delaware Code, and no notice of Review de Novo having been filed by either party within 10 days from ___4/12/90___ the date of the Master's written order,

IT IS ORDERED THAT THE PETITIONER AND RESPONDENT ARE DIVORCED FROM THE BONDS OF MATRIMONY.

FAMILY COURT OF DELAWARE

FOR NEW C ...

I hereby certi ...

is a true copy of t ...

appears in the records of this C ...

Date　4-18-01

By　D. W ...

　　　　　Clerk of Court

Executed this date ___4/24/90___　　　　　　　　　　　　　

　　　　　　　　　　　　　　　　　　　　　　　JUDGE

　　　　　　　　　　　　　　　　　　　　JOHN T. GALLAGHER

A-105  1 2

Case 1:07-cv-00745-MPT    Document 252    Filed 06/27/2008    Page 37 of 72



# Certificate of Marriage
## State of Maryland

**LICENSE NO.**
**109078**

### CECIL COUNTY (07)

*I Hereby Certify* that on the 14TH day of June 19 96

the following persons were by me united in marriage at _Elkton, Maryland_
(City or Town)

in accordance with the License of the Clerk of the Court in the jurisdiction shown above.

Groom's Name _David Edward Jones_ Age _65_ Birthplace _Delaware_ (State)

Residence _Delaware City, Delaware_ Marital Status _Divorced_
(Town or City) (County) (State)

Bride's Name _Helyn Marie Ayers_ Age _55_ Birthplace _New Jersey_ (State)

Residence _Delaware City, Delaware_ Marital Status _Divorced_
(Town or City) (County) (State)

Relationship to groom if any _None_

Groom's S.S. No. _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_

Bride's S.S. No. _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_

_Janice A. Potts_
Signature of Authorized Officer

_Deputy Clerk of the Court_
Title and Office

License Date _June 14, 19 96_

_Elkton, Maryland_
Address of Authorized Officer

103

A-106

Ms. Leona P. Lum
2195 Crystal Beach Rd.
Earleville, MD 21919-1702
410-275-2064

May 15, 2001

Dear Wilkie

I have been hunting for a picture to send you. I finally found one that her father had saved in his wallet, and one taken when they were married. I haven't found any of the other papers your father asked for so I am sending these along to you.

Sincerely,
Leona Lum

104

A-107



A-108

April 19, 2002

David E. Jones
1 Warfel Drive
Delaware City, De 19706

Delaware City Volunteer Fire Company
Clinton Street
Delaware City, De 19720
Attn: Tammy Finnegan

Re: Emergency Transport to Veteran Hospital
January 14, 2000 – David E. Jones #1 Warfel Dr.
                    Delaware City, De 19706

Dear Ms. Finnegan:

My name is Vickie L. Snyder, on April 10, 2002, I contacted your company
and left a message for you regarding an emergency transport of my father to
the Veterans Hospital.
Since then you have contacted him requesting a letter stating his need for a
copy of the ambulance report that I requested for him.
He is in need of documentation of the events of his original surgery, the
events following that sent him back to the hospital and the follow up care
and billings pertaining to his surgery and the second surgery that was
needed to correct the first surgery.
He would like to have a copy of the report taken during this transport on
April 10th and any information you have on him and his trip to the hospital.
Im not sure if he will be dropping off this letter or if it will be mailed to you.
If he does not drop it off and pick up a copy of the report we requested,
would you please contact him at 834-3269 so that he may arrange to have it
picked up or mail it as soon as possible  to him at the above address or
myself  Vickie L. Snyder, 135 Bellanca Lane, Collins Park, New Castle, De
19720.

Thank you for your assistance in this matter.

David E. Jones

Vickie L. Snyder

121

A-109

# DELAWARE AMBULANCE REPORT

DELAWARE HEALTH AND SOCIAL SERVICES
Division of Public Health

| AMBULANCE UNIT # | A-9 |
| CASE # | |
| INCIDENT # | 189 |
| END MILEAGE | 47662 |
| START MILEAGE | 47588 |
| TOTAL MILEAGE | |

DATE: 1-19-00   ALARM TIME: 1454   10-6 TIME: 1454   10-2 SCENE: 1505   TRANS INITIATED: 1512   ARRIVAL HOSPITAL: 1531   10-7 TIME: 1609

MEDICAL: ☐ PSYCHIATRIC ☐ POISONING ☐ CARDIAC ☐ FULL ALU/OBT ☐ MATERNITY ☐ 10-79 TRANSPORT
TRAUMA: ☐ ACCIDENT ☐ MVA ☐ PEDESTRIAN ☐ HOME ☐ INDUSTRIAL ☐ BURNS ☐ OTHER

NAME: David E Jones   AGE: 68

INCIDENT LOCATION: 1 Warfield Dir Harbor Est.

INSURANCE: Medicare

HOME ADDRESS: 1 Warfiel Dr   Harbor Est   Del. City DE   SOCIAL SECURITY #: 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   DATE OF BIRTH: 03-19-31

CHIEF COMPLAINT: Sick and Vomiting for 2 days

HISTORY OF PRESENT ILLNESS: Had Hernia Surgery on Tues 1-11-99

### PAST MEDICAL HISTORY
☐ ANGINA ☐ CVA ☐ SEIZURES
☐ CHF ☐ DM ☐ CANCER
☐ CAD ☐ COPD ☐ PACEMAKER
☐ HTN ☐ ASTHMA ☐ CARD BYPASS
OTHER: Surgery last Tues

### CURRENT MEDICATIONS
☐ NONE

### ALLERGIES
NKDA

## PRIMARY SURVEY

| PARAMETERS | ASSESSMENT | INITIAL INTERVENTION | OUTCOME |
|---|---|---|---|
| AIRWAY & CERVICAL SPINE | ☑ PATENT ☐ COMPROMISED ☐ OBSTRUCTED | ☐ NONE NEEDED ☐ REPOSITION ☐ ORAL/NASAL AIRWAY ☐ MANUAL TECHNIQUE ☐ ABD/MANUAL THRUST ☐ SUCTIONING OTHER: C-SPINE CONTROL ☐ MANUAL INLINE | ☐ NO CHANGE ☐ IMPROVED ☐ WORSENED |
| BREATHING | ☑ NORMAL/ADEQUATE ☐ LABORED ☐ RAPID ☐ ABSENT ☐ SHALLOW ☐ SLOW ☐ DEEP BREATH SOUNDS | ☐ NONE NEEDED ☐ MOUTH TO MOUTH ☐ MOUTH TO MASK ☐ BAG VALVE MASK ☐ OTHER ___ LPM ☐ NASAL CANNULA ☐ SIMPLE FACE MASK ☐ NONREBREATHER MASK | ☐ NO CHANGE ☐ IMPROVED ☐ WORSENED |
| CIRCULATION | RADIAL PULSE: ☑ NORMAL ☐ THREADY ☐ RAPID ☐ SLOW ☐ ABSENT ☐ IRREGULAR  CAROTID PULSE ☐ PRESENT ☐ ABSENT  CAPILLARY REFILL ☐ NORMAL ☐ DELAYED  SKIN: ☐ NORMAL ☐ PALE ☐ FLUSHED ☐ CYANOTIC ☐ DRY ☑ MOIST ☐ WARM ☐ COOL  SEVERE HEMORRHAGE ☐ YES ☑ NO | ☐ NONE NEEDED ☐ POSITIONED FLAT ☐ SEMI-AUTOMATIC EXTERNAL DEFIBRILLATOR APPLIED ☐ CHEST COMPRESSIONS ☐ HEMORRHAGE CONTROL ☐ OTHER | ☐ NO CHANGE ☐ IMPROVED ☐ WORSENED |
| DISABILITY & EXPOSURE | EYE OPENING: ☐ SPONTANEOUS (4) ☐ TO VOICE (3) ☐ TO PAIN (2) ☐ NONE (1)  TOTAL GLASGOW COMA SCORE: 15 | BEST VERBAL RESPONSE: ☑ ORIENTED ☐ CONFUSED ☐ INAP WORDS ☐ INCOMP WORDS ☐ NONE  BEST MOTOR RESPONSE: ☑ OBEYS COMMANDS ☐ LOCALIZES (PAIN) ☐ WITHDRAWS (PAIN) ☐ FLEXION (PAIN) ☐ EXTENSION (PAIN) ☐ NONE | |

SPINAL IMMOBILIZATION: ☐ CERVICAL COLLAR ☐ FULL BOARD/CID   N/A   EXTRICATION: ☐ KED/HALF BOARD ☐ RAPID EXTRICATION   TIME: N/A

## SECONDARY SURVEY

| TIME | PULSE | RESP | BLOOD PRESSURE |
|---|---|---|---|
| | 72 | 28 | |

| | |
|---|---|
| SKULL, FACE | ☑ NORMAL FINDINGS |
| PUPILS | SIZE R ___ mm L ___ mm   REACTIVE ☐ POS ☐ NEG |
| JUGULAR VEINS | ☑ NORMAL ☐ DISTENDED |
| NECK AND C-SPINE | ☑ NORMAL FINDINGS |
| CHEST | ☑ NORMAL FINDINGS |
| LUNGS | RIGHT ☐ CLEAR ☐ WHEEZES ☐ RALES ☑ RHONCHI ☐ SILENT  LEFT ☐ CLEAR ☐ WHEEZES ☐ RALES ☑ RHONCHI ☐ SILENT |
| ABDOMEN, PELVIS | ☑ NORMAL FINDINGS |
| EXTREMITIES, BACK | ☑ NORMAL FINDINGS |
| NEUROLOGICAL | ☑ NORMAL FINDINGS |

HOSPITAL: VA Hosp

RECEIVED BY: Staff Would not sign   MEDIC UNIT #

CREW: DRIVER: P. Smith
ATTENDANT(S): S. Betts

### NOTES

Pt has been sick for
2 day vomiting
Pt state he has felt
bad since surgery
on the way to VA Hosp
Re-eval lung sounds
Pt sounds full of
fluid ...

# Department of Veterans Affairs

TRANSCRIPT OF HEARING

BEFORE

BOARD OF VETERANS' APPEALS

WASHINGTON, D.C.  20420

Sitting at Wilmington, Delaware

| | | |
|---|---|---|
| IN THE APPEAL OF | : | JONES, David E.<br>SS 222 12 4185 |
| DATE | : | August 23, 2006 |
| REPRESENTED BY | : | Thomas Reid |
| MEMBER OF BOARD | : | Shane Durkin, Chairman |
| WITNESSES | : | David E. Jones, appellant<br>Vicky Snyder |

VA FORM 1-4050, APR 1980                                             605158

203

A-111

JONES, David E.
SS 222 12 4185

CHAIRMAN: This is Shane Durkin; I'm presiding at a Board of Veterans' Appeals travel board hearing in Wilmington, Delaware. Today's date is August 23, 2006. This is the appeal of David E. Jones; his VA file number is SS 222 12 4185.

Mr. Jones is present in the hearing room with his daughter, Vicky Snyder; also present in the hearing room is Professor Thomas Reid, who is representing the veteran in this appeal.

The issue before me is: Whether new and material evidence has been presented to reopen a claim for compensation under 38 U.S.C.A. § 1151 for the postoperative residuals of a hernia repair. I was informed prior to the hearing that that is a correct statement of the issue before me.

Will both of you remain seated and raise your right hands.

(OATH ADMINISTERED)

CHAIRMAN: Thank you very much. Professor Reid, I'll turn it over to you now.

MR. REID: Thank you, Your Honor. Very briefly in the matter of opening remarks; you've correctly stated the issue, whether or not Mr. Jones has presented sufficient new and material evidence to reopen his claim for 1151 benefits, service connected.

We've submitted a medical expert's report from Dr. David Shokun, who's examined Mr. Jones's entire medical file and came to the conclusion there were four serious issues; two of which led directly to the surgery, we believe, was performed without his consent and evidently there is no evidence of any consent to undertake the operation as a nonemergency operation. We found none in the records, which we think were very significant issues.

Also there is a failure according to Dr. Shokan to properly prepare Mr. Jones, who was a fairly high-risk patient with prep of antibiotics to avoid the type of infection he developed post surgery. Both of those, I think, are sufficient grounds to reopen this on account of

2

204

A-112

JONES, David E.
SS 222 12 4185

new and material evidence, because it's the first expert report that Mr. Jones had submitted on his behalf.

CHAIRMAN: OK. Would you like to proceed with your questioning?

MR. REID: Yes, I would, Your Honor. Let's start with Mr. Jones. Mr. Jones lets talk a few minutes about your background.

MR. REID to Veteran:

Q. You were in the military service correct?

A. Yes sir.

Q. And what branch was that?

A. Army.

Q. When were you in sir?

A. Went in January 28, 1952; and my ETS was November 19, 1953.

MR. REID: Are we picking up on the microphone?

CHAIRMAN: I think we are but just speak a little bit louder if you could Mr. Jones; it would be helpful so we get a good, clear record.

MR. REID to Veteran:

Q. Did you serve in combat sir?

A. A Police action.

3

A-113

2C5

JONES, David E.
SS 222 12 4185

Q.  How?

A.  It took them 40 years to declare it a war.

Q.  Moving ahead in time to the year of 1999.  Is that the time you consulted a VA doctor about a condition you had?

A.  Yes.  I came in and checked with them about a hernia.

Q.  When you say hernia, what part of you body did you have a hernia?

A.  My stomach, my belly-button was an outy.

Q.  The witness is pointing towards his navel.  What kind of job did you have at that time Mr. Jones?

A.  Driving truck.

Q.  Did that hernia cause you any problems as far as your work was concerned?

A.  Well, it was starting to bother me and, uh, I had to pull chains down and I have to pull the straps down on the tarp when I'm driving truck, and it got to where it was bothering me too much.

Q.  Now, did the VA doctor recommend that you do anything?

A.  All I remember is talking to him.  Then he got to talking about donating my body parts.  I said, well, I don't sort of favor donating my body parts if anything should happen to me.

Q.  But was there some suggestion you should have surgery on the hernia?

JONES, David E.
SS 222 12 4185

A. They said you should have, but I said, well, I don't know when; he said, I'll let you know when.

Q. Did there came a time when you were scheduled for a hernia repair?

A. Yes.

Q. And when would that had been sir?

A. I don't remember the exact date, but it was in January.

Q. January of what year please?

A. I believe it was 2000.

Q. Do you remember the name of the doctor who was gonna do the surgery on you?

A. No, I don't.

Q. When you came to the hospital for that surgery, did you have any papers to sign, if you recall?

A. Not that I know of.

Q. Now, I don't want to embarrass you, but I think it's important, Mr. Jones, do you have a problem with reading?

A. Yes, I do.  I don't have any education whatsoever.

Q. Did anybody ever read to you a form called consent to conduct medical surgery, an operation?

2(7

JONES, David E.
SS 222 12 4185

A. No.

Q. Did anybody ever read to you a form permitting medical students to observe your operation, you know, to participate?

A. Um.

Q. So you went ahead and had the surgery, was that outpatient or inpatient?

A. It was supposed to be outpatient, did the operation the next day.

Q. Let's just talk about that. You were released the next day?

A. Yes sir.

Q. I think the record will reflect that on 12th of January, 2000, you went home?

A. Yes sir.

Q. And how did you do at home?

A. Well, I was having problems and my wife went to work; she came home from work that day and she had to call the ambulance right away.

Q. Well, what kind of problems were you having sir?

A. I told her I was having bowel problems; I couldn't go to the bathroom and all of a sudden it--

Q. You couldn't take a crap right?

A. That's right.

6

2 8

A - 116

JONES, David E.
SS 222 12 4185

Q. And were you throwing up?

A. Yes sir.

Q. What were you throwing up sir?

A. Defecating, shit. Excuse the expression; it didn't taste very good. And the ambulance rushed me to the hospital.

Q. Were you still conscious when the ambulance came?

A. Just enough to tell them I needed something to throw up in or go to the bathroom in; he says you can't go to the bathroom here. I said it's coming out of my mouth; and he said, oh, wait a minute; he grabbed a 5-gallon bucket; he said, oh my God and that's all I remember.

Q. All right, when do you next remember anything?

A. When they worked me up in the hospital, there.

Q. That would be after your surgery?

A. Yes sir.

Q. And who was present at that time if you recall?

A. I don't remember; from what I hear, they called on my family. They was gonna give me last rites.

Q. But I guess it's fortunate to say, that you survived?

A. Yes, I did.

JONES, David E.
SS 222 12 4185

Q. Let's talk a bit about your condition today. Does that area of surgery still bother you?

A. Yes, it does.

Q. Tell the Judge please, how it bothers you and how it affects your ability to drive a truck?

A. I have pains; I can't drive a truck because I can't wear the seat belts. I had a seat belt in my truck and I had to have it loose because I cannot wear a tight seatbelt, it just tears me up. I can't lift anything.

I'm used to getting out there working; I drove tractor and trailer 53 years and this is just tearing me up sitting home all the time. My wife has to work; she works four nights a week to help out.

Q. Well, let's talk about the surgery. Did you have a scar from your surgery?

A. From here to here.

Q. Do you have any problems showing the Judge? We got a scar here, approximately 16-inch. Here's a scar.

A. I don't know what that--

Q. It bothers you?

A. Yep.

CHAIRMAN to Veteran:

Q. Do you have tenderness at the scar itself?

JONES, David E.
SS 222 12 4185

A. Yes sir.

CHAIRMAN: OK.

VETERAN: My wife brought me back for a checkup after they had redone the surgery; this doctor took a lance--had these cusbusters down there and he went--I said you do another one and I'm nailing you, because it hurt. They didn't give me nothing; he just took the scalpel, whatever you call them, cut them open and shoved gauze in; I thought that as very ignorant myself.

MR. REID to Veteran:

Q. Speaking, just as how you're feeling today, I think you told the Judge, to make it clear, you can't go back in the cab driving an 18-wheeler?

A. No, I can't.

Q. Because of?

A. Because of my stomach and I couldn't stand the bouncing in the truck either.

Q. So you haven't worked since 2000?

A. That's right.

Q. And are you receiving any benefits under Social Security?

A. No, just my retirement Social Security, that's it.

MR. REID: I have nothing else. Mr. Jones, anything else you want to tell the Judge that I haven't talked about yet?

JONES, David E.
SS 222 12 4185

Q. At that point in time, he didn't have any discussion with you about what the potential risks were?

A. No, they did not.

CHAIRMAN: I know Professor Reid is really on top of this, but I'm going to ask any way, are there any outstanding records that you think I should obtain?

MR. REID: I think there's a pending motion. I haven't raised it. I requested the following assurance records. I understand the problems with regard to quality assurance and the claim of privilege, but I have to raise, many of the things we're talking about, consent forms and the quality assurance as opposed as to being in the regular medical file of Mr. Jones.

CHAIRMAN: OK, I have no further questions for Mr. Jones.

MR. REID: I'd like to turn to Mrs. Snyder if I could.

MR. REID to Mrs. Snyder:

Q. Just for the record, would you give us your full name and your address?

A. My name is Vicky Snyder and I live at 135 Vilanky Lane, in New Castle, Delaware.

Q. Are you related to the claimant Mr. David Jones?

A. Yes, I am. He's my father.

Q. I'm going to go back now to the end of 1999. Were you aware that your father was going to have some kind of elective surgery for his hernia?

11

**212**  A-120

JONES, David E.
SS 222 12 4185

A.  I'm not sure that I knew that he was having it.  I knew after he had it.

Q.  And why did you learn about it after he had it?

A.  Well, I got a phone call and I talked to both my stepmother and my cousin and between the two of them it was conveyed to me that he was rushed to the hospital; he was in the VA hospital and they didn't think he was gonna make it.  He had had a hernia operation and something went wrong with the operation and he was back in the hospital.

Q.  When you're saying the VA Hospital, referring to the VA Medical Center in Wilmington, Delaware?

A.  Yes, I am.

Q.  And what did you do?

A.  I went to the hospital.

Q.  When you arrived at the hospital, who was there if you recall?

A.  I passed Helen on my way in; Helen would be my stepmother, his wife; and my cousin Art was at Dad's side at that time; I believe his wife was on her way down with Helen at that moment.

Q.  That would have been in what part of the hospital?

A.  He was in a hospital room.

Q.  He was not in the emergency room?

A.  He was in a room, I guess it was; it might have been in a recovery room; there were other beds around him, so I don't know if it was a ward or a hospital room; I

12

213    A-121

don't know exactly how they would define it based on the difference in that appearance.

Q. So what happened then?

A. Well, Art and I were standing there and Art didn't seem to know what was going on, except they didn't think he was gonna make it; he wanted all the kids called in, they're all ours; he's got seven children. So they wanted all of us called in there and phone calls were being made; not everybody has everybody's number, not everybody's number is listed; not everybody sees everybody all the time.

So I had gotten the numbers together, so phone calls could be made and we were sort of phone-chaining around to get everybody there and at that point a doctor came in the room and he came over to talk to us and I asked him, I said--

Q. Before we go further, do you know the name of this doctor?

A. The doctor's name was Dr. Eisenberg.

Q. How are you aware of his name?

A. Well, my kids go to Hariel Eisenberg Elementary School, so it was real easy to remember the name and it was on his jacket or a pin.

Q. You said there was a conversation between Dr. Eisenberg and members of the family at that time?

A. Well, yes, primarily Art stood there while sometimes I come out and say what I have to say or ask what I have to ask sometimes and I just asked him, I said, this was just a simple hernia operation, what happened? And Dr. Eisenberg's answer to me was--something screwed up and then he proceeded to tell me that his bowel was fixed into this stomach.

13

214    A-122

JONES, David E.
SS 222 12 4185

I wouldn't have known what they did, except for his explanation as to what happened and he didn't give much of an explanation beyond that; that somebody screwed up and that his bowel was fixed into his stomach; I didn't know that could happen, because if you're not a doctor, you don't know what parts are pushed to what part, you know.

Q. What happened then after that?

A. Basically, a few people at a time started coming up and as some came up others went down. What happened in my home was my son wanted him out of the VA hospital, my oldest son and, um, he, um, I think it upset Helen because she's actually the person in charge of him while he's in there, she's the stepmother and the step grandmother and my son who works in firefighting and emergency rescue and all of my kids are involved in that, wanted him out of here because he thought he could get better care with Christiana.

Rather than cause a problem for Helen, we honored her wishes, we knew where he was; and at that point, he was still unconscious at that point, so, you know, that's as far as we got with that at that point.

Q. One more matter I think we need to go into; I think we've already spoken to your father. Is he able to read or write?

A. No.

Q. How did the family deal with that?

A. The family doesn't deal with it; I deal with it. He thinks I'm his personal secretary, so he takes like, I take him to the doctor's; I take him to the eye doctor's; I take him for visits to you and anywhere else he has to go.

He drove truck for years and filled out a log, but that was usually accompanied by the help of his wife because he can take you anywhere you want to go, but you have

JONES, David E.
SS 222 12 4185

to get him a map and show him and explain where it is and read to him what's on the map, to get there.

Now, they say these things are--he went to about 5th grade and his family were farmers; at that point, he got out of school, he left school, he went to work on the farm; that's basically where he went from there and in his day and age, you could do that, OK.

Q. Having this experience, did anyone ask you to come down with your father to read any of these medical concerns at all?

A. No, I wasn't called at all. I wasn't even sure the date the surgery took place at that date, because I wasn't, you know, he wants to be able ...(inaudible) he went by himself and he didn't, and they didn't ask for help, they didn't ask could you read it. He didn't say you need to go with me, the papers are signed.

Although I've been here in numerous times, here and Carey Baker's Office and with you and, um, and I do think a lot of his problems, because I have a son in that predicament; I have a son, who is ADD, dyslexic ...(inaudible) and spatial, and these things are usually generally inherited somewhere and in his day and age that would have had names for them.

So, I did think that some of his reading difficulties growing up as a child in LBM Elementary School, frustrating him to the point he wanted to leave school; may have been he couldn't read it, because he may be dyslexic; in his days I don't know if they tested you for that or how they would find that out; but I think that that probably coupled with not being able to learn might have been his reasons for that, because that particular son could not read until he was in 5th grade.

And only through the good grace of Chuck Freebury at the school district got him the help he needed and found out that, that when the school couldn't test and find out what was wrong with him and he scored too high for Special Ed., they took him out of the district and AI already ...(inaudible) from AI Hospital did the testing and

JONES, David E.
SS 222 12 4185

that is the only way we found out it was not an easy thing to figure out; it was not easy thing to pull together; so I would imagine in his day and age, it was even harder and nobody recognized it and you were just a kid that would stupid, couldn't learn, dumb, whatever they wanted to call you.

MR. REID:  Well, thank you very much Mrs. Snyder.  I have nothing further to ask you at this point.  Do you have any questions?

CHAIRMAN:  Just one thing and I think you answered this.

CHAIRMAN to Veteran:

   Q. Mr. Jones, you actually went to the VA hospital by yourself, no one accompanied you or assisted you?

   A. Yes sir.

CHAIRMAN:  Would that be the normal procedure?

MS. SNYDER:  That is 100 percent; behind the military and the VA and as far as he's concerned, they can do no wrong, OK.  So understand this, when he came here, he could have went to any hospital; he chose here because he feels that as a veteran, it's his right to come here; this is where he should be.

So being as independent as he wants to be, yes, he's been here for cataract surgery; he's been here for foot surgery and, you know, when he wants to go somewhere he really wants to do it himself; he doesn't want to be tied down with other people, like dragging along and I think it's embarrassing when you have to have somebody read everything you're doing.

MR. REID:  I understand.

JONES, David E.
SS 222 12 4185

<u>MS. SNYDER</u>:  And I think that is why he came in here, because he had a problem; I don't think he knew it was going to turn into what it did and the surgery and not having to apply for things before and not having somebody there to do it, or tell him you need somebody to read it to you, you know, he thought he was fine.

<u>CHAIRMAN to Veteran</u>:

Q. So, let me make sure I understand; so first of all, as far as Mr. Jones recalls, he didn't sign anything other than the living will?

A. That's all I remember signing.

Q. Secondly, I assume you didn't inform anyone that you can't read?

A. Well, I told them in here, when they said I had paperwork to do; I said, you people have to fill that out, I said, because I can't read or write.

Q. And which paperwork is this that you're referring to?

A. I said, if they had any paperwork, they would have to fill it out because I can't read nor write; I said I have my Social Security card and VA card, that's all.

Q. Who did you tell this to?

A. Them doctors, I don't know who they were.

Q. OK, so you volunteered that?

A. Yes.  I volunteered my paperwork, you know, my medical card and my Social Security number and that was it.

Q. And they never asked you to complete anything or--

A. No, they didn't.

MS. SNYDER: He can't fill out the intake papers when you go to the family doctors, when they want you to fill out a new page, and he can't fill out; when he goes to the eye doctor's, when I go with him, I primarily fill out all of his preliminary papers. He brings his cards, his ID's and everything, but he doesn't know what you want with paper. Like he could do like a name or address but if you ask other questions, he really doesn't know what they're asking.

I pretty much go along with him and I make sure, I do, since all of this happened, even more, because he doesn't know what he's filling out; he doesn't understand it, you know, he just had a chest X-ray done, I mean, we go with everything.

CHAIRMAN: OK, I understand your contention. Professor?

MR. REID: I have nothing further at this time, Your Honor. I do ask that you waive--we submit a brief in support of the findings. It's all done; it simply wasn't in the file this morning.

CHAIRMAN: OK.

MR. REID: We'll mail it to you, certified mail, to Ms. Johnson-Clark?

CHAIRMAN: Yes, that would be good; and she'll make sure it's associated with the claims folder; and I assume you don't really need additional time for that purpose, that you've already prepared the brief?

MR. REID: It will be in the mail this afternoon, Your Honor--

CHAIRMAN: OK, great.

MR. REID: --in Washington, hopefully within a few days.

219  A-127

JONES, David E.
SS 222 12 4185

CHAIRMAN: Well, it's a pleasure to meet both of you and your testimony will be helpful when I get back to Washington; the claims folder will come to me in docket order with a transcript of this hearing.

I will consider everything that's been said at this hearing, the evidence in the claims folder and the brief that your representative is submitting on your behalf.

If I determine that further development of the record is warranted, as suggested by Professor Reid, I'll make sure that's done before I decide your appeal.

When the record has been properly developed, I'll put my decision in writing and give you and your representative a copy, OK?

VETERAN: Yes sir.

CHAIRMAN: Any questions?

VETERAN: No sir.

MS. SNYDER: I just have one. I'm sorry I missed it. How long will the decision take?

CHAIRMAN: Well, yeah, that's the number one question.

VETERAN: This is Army.

CHAIRMAN: That's the number one question, and the problem is that I don't have your father's docket number. I know that generally the transcript will be made in 2 or 3 months; so if your father's docket number comes up within that period of time, I would get the case in 2 or 3 months.

I would say it would be unlikely that the case would come to me in less than two months, but again, there are a lot of claimants and we do them in docket order, so it might be that your father's file will sit on a shelf until his turn comes up.

It's not that, you know, I'm putting it off.

MS. SNYDER: I believe you.

CHAIRMAN: It's really just a matter of fairness.

MS. SNYDER: I do paperwork and things.

CHAIRMAN: I'll follow up on one thing; Mr. Jones, how old are you?

VETERAN: 75.

CHAIRMAN: You're 75?

VETERAN: Yes sir.

CHAIRMAN: Would you like me to advance your case on the Board's docket?

VETERAN: Yes sir.

CHAIRMAN: Well, that will be done; that means that you will go to the head of the docket with other people who have had their case advanced on the docket; there is actually a provision in the law for veterans who are 75 or older for us to advance, so you go to the front of the line.

VETERAN: I don't have much time left.

CHAIRMAN: That does mean that your case will come to me more quickly. I will make sure that is done, OK?

VETERAN: I appreciate it.

JONES, David E.
SS 222 12 4185

CHAIRMAN: Sure thing.

MS. SNYDER: Thank you.

CHAIRMAN: You're welcome; if there is nothing further, the hearing is ended.

MR. REID: Thank you, Your Honor.

CHAIRMAN: You are most welcome sir.

MS. SNYDER: Thank you very much.

CHAIRMAN: You're welcome.

(HEARING ADJOURNED)

WB--062491052.049--rtw



**DEPARTMENT OF VETERANS AFFAIRS**
**Board of Veterans' Appeals**
**Washington DC  20420**

SEP 1 2 2006

In Reply Refer To: 0141F52
SS 222 12 4185

Mr. David E. Jones
1 Warfel Drive
PO Box 165
Delaware City, DE  19706

Dear Mr. Jones:

This is a notification of the ruling on the motion to advance your case on the Board's docket, as stated at your August 23, 2006, Travel Board hearing.

Under the provisions of 38 U.S.C. § 7107 and 38 C.F.R. § 20.900(c), appeals must be considered in docket number order, but may be advanced if good or sufficient cause is shown. Good or sufficient cause has been shown. The motion to advance the appeal on the Board's docket is granted.

In compliance with this action, the Board will take prompt action to promulgate a decision in this case. You will receive a copy of the Board's decision as soon as it is issued.

Sincerely yours,

Shane A. Durkin
Veterans Law Judge

cc:    Thomas J. Reed, Esq.

223

A-131

# DELAWARE VALLEY PHYSICIANS & SURGEONS, P.A.

## THE SURGERY GROUP

Robert C. Villare, M.D.
Mudiwa P. Munyikwa, M.D.

GENERAL SURGERY / SURGICAL ONCOLOGY
PERIPHERAL VASCULAR SURGERY
CARDIOTHORACIC SURGERY
LAPAROSCOPY & THORACOSCOPY
SURGICAL TRAUMA & CRITICAL CARE

Thomas Reed, Prof. of Law and Director                June 20, 2007
Veterans Law Clinic
Widener University School of Law
4601 Concord Pike PO Box 7474
Room 219 School of Law
Wilmington, DE  19803-0474

Dear Professor Reed:

I reviewed the records provided by you regarding David E. Jones CSS 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 consisting of multiple pages of his VA claim file. These records include the transcript from the Board of Veterans Appeals Hearing taken on August 23, 2006. Mr. Jones underwent an elective repair of a reducible umbilical hernia on 1-11-2000. He was discharged on 1-12-2000. There is no documentation that preoperative antibiotics were given. There is also no evidence of an informed consent in the records. The patient returned to the emergency room two days after being discharged because of "vomiting of stool" and being very ill. He was taken to the operating room on that same day for emergency laparotomy. The abdominal X-ray on 1-14-2000 reports "vomiting of stool and no evidence of small or large bowel obstruction". Again, there is no operative report to define the procedure or findings at surgery on 1-14-2000. There is no operative report for the initial surgery of 1-11-2000. This patient remained intibated after the operation of 1-14-2000. He was discharged on 1-21-2000 from the Jan 14th emergency admission to repair a complication resulting from the initial (1-11-00) surgery done at the VA Hospital.

He was again seen on 2-7-2000 because of shortness of breath, fever, chills and malaise. This is consistent with infection and sepsis. In fact, a wound infection was diagnosed, drained and treated. Theses post-operative infectious complications led to the finding of a recurrent facial defect/ventral hernia on 2-28-01. In essence, the initial two operations failed. This required yet another surgical procedure on 3-13-01 to repair the recurrent peri-umbilical/ventral hernia. It is evident from the record that the patient experiences residual pain as a result of the three operative procedures and complications which accompanied those procedures. Although I have not examined the patient, from the records it is apparent that there is a mild to moderate residual physical impairment due to the abdominal pain and scarring from his multiple surgeries.

Summary:

1. I find no written informed consent for any of the operative procedures in the records. This violates every known standard of care across the nation, including government provided medical services, and is consistent with negligent malpractice by omission.

2. There is no dictated/written operative report from any of the operative procedures pertaining to the ventral/umbilical hernia repair or any subsequent remedial operations. The only mechanism for a patient to vomit feces {in a patient without evidence of bowel obstruction}, if in fact that description is accurate, is via a gastrocolic fistula. The X-ray on 1-14-2000 shows no

❏ 232 MITCHELL STREET, SUITE 201
MILLSBORO, DE 19966
302-934-8990
FAX 302-934-1527

❏ 559 MANTUA AVENUE
PAULSBORO, NJ 08066
856-423-4500
FAX 856-423-4594
BUSINESS OFFICE

❏ MEMORIAL HOSPITAL OF SALEM COUNTY
SALEM, NJ
856-935-5000
FAX 856-423-4594

264

ALL CORRESPONDENCE TO BUSINESS OFFICE

A-132

evidence of small or large bowel obstruction. I find it both careless, negligent and harmful to the patient to create a gastrocolic fistula during the elective repair of an umbilical/ventral hernia. An unidentified serosal tear of the small intestines or large intestines would also be careless and rise to the level of substandard care. There were references made to a serosal tear during the January 14, 2000 surgical procedure.

In the face of fecal vomiting and enteric leakage, it was poor judgment to close this incision. There are various techniques, whether using Wick Drains and closing the incision loosely or leaving the incision packed open, to prevent subsequent infection for which this patient was at a high risk after the second operation. The incision was obviously not properly handled, as the patient presented with signs of sepsis and wound infection on 2-7-2000 requiring incision, drainage and antibiotics. This infection led to failure of the hernia repair and the subsequent fascial defect which is noted on 2-28-01. This required yet another repair. The postoperative wound management after the 1-14-00 surgical procedure is poor judgment and does not rise to the level negligent malpractice. However, the errors in judgment and overall care of this patient are consistent with other breaches as noted above, which I do consider as clearly falling below the acceptable standard of care in the community and negligent malpractice.

The treatment rendered at the Veterans Administration Hospital caused harm to David E. Jones. It is my opinion, with a reasonable degree of medical certainty, that the treatment rendered rises to the level of negligent malpractice. Furthermore, the failure of the Director of Medical Records to release this patient's operative reports is clearly obstructive to this patient's claim. The patient signed a release for medical records and those records were properly requested by his counsel. There is no valid reason that meets the administrative standard of care anywhere in this country that those records be sequestered and not provided as part of the patient's medical record. Operative reports are not considered peer review.

The above opinion is based upon information provided to me to this date. If further information or testimony is provided, I reserve the right to amend this report.

Sincerely,

Robert C. Villare, MD, MPA
Director, Delaware Valley Physicians and Surgeons

# CURRICULUM VITAE

## ROBERT C. VILLARE, MD

| | | |
|---|---|---|
| **Offices:** | **559 Mantua Avenue**<br>**Paulsboro, NJ 08066**<br>**Phone: (856) 423-4500**<br>**Fax:    (856) 423-4594** | **Memorial Hospital of Salem County**<br>**310 Woodstown Road**<br>**Salem, NJ 08079**<br>**800-521-4225** |
| | **Milford Professional Center**<br>**802 N. DuPont Highway**<br>**Suite 5**<br>**Milford, DE 19963** | **500 Route 73 South**<br>**Marlton, NJ 08053** |
| | **Date of Birth** | July 9, 1954 |
| | **Place of Birth** | Woodbury, New Jersey |

## EDUCATION:

| | |
|---|---|
| 1972-76 | Bachelor of Arts<br>Rutgers University, Camden, NJ |
| 1976-77 | Glassboro State College (Science) |
| 1978-79 | New York Institute of Technology |
| 1979-82 | MD Degree<br>American University of the Caribbean<br>School of Medicine<br>Montserrat, British West Indies |
| 2003 – 2006 | Rutgers University Graduate School & Johns Hopkins University Graduate School of Business-Health Care Administration & Public Policy. |
| 2005 | GME Patient Safety Curriculum: Developing Faculty Leaders and Pioneers. National Center for Patient Safety. |

**May 17, 2007 Masters Degree in Health Administration & Health Policy**
Rutgers University School of Business & Public Administration

**Board Certified: American Board of Surgery. Recertified to 2012**

266

1

A-134

**CURRICULUM VITAE**
**Robert C. Villare, MD**
**Page 2**

## POST GRADUATE TRAINING AND FELLOWSHIP APPOINTMENTS:

| | |
|---|---|
| 1982-84 | Internship and Residency in General Surgery |
| | Presbyterian-University of Pennsylvania Medical Center |
| | Philadelphia, PA |
| 1984-86 | Resident in General Surgery |
| | Episcopal Hospital |
| | Philadelphia, PA |
| 1986-87 | Chief Resident in General Surgery |
| | Episcopal Hospital |
| | Philadelphia, PA |
| 1989-89 | Vascular Surgery Fellowship/Medical College of Pennsylvania |
| | Drs. Reichle/Suero (January-December) |
| 1991 | Laparoscopic Surgery - Massachusetts General Hospital |
| | Course in Gall Bladder & Biliary Surgery |
| 1996-1997 | Thoracic Surgery Fellowship - Pennsylvania Hospital |
| | Philadelphia, PA |

## ADDITIONAL SKILLS AND QUALIFICATIONS:

Computer Proficiency: SPSS-Statistical Database
Health & Disability Insurance Producer-Licensed in the State of New Jersey
American Society of General Surgeons-Certified Medical-Legal Expert Witness
Medical Informatics-EMR Development
Consultant-HealthCare Provider Agreements
Real Estate Development

## FACULTY APPOINTMENTS:

| | |
|---|---|
| 1993-96 | Associate in Surgery |
| | University of Pennsylvania School of Medicine |
| | Philadelphia, PA |
| 1991-99 | Instructor of Clinical Surgery |
| | Thomas Jefferson University/Jefferson Medical College |

A-135

**CURRICULUM VITAE**
**Robert C. Villare, MD**
**Page 3**

## HOSPITAL AND ADMINISTRATIVE APPOINTMENTS:

| | |
|---|---|
| 1990-94 | Chairman, Department of Surgery Quality Assurance Committee Jefferson University-Methodist Hospital Division Philadelphia, PA |
| 1990-91 | Medis Group Quality Assurance Committee Episcopal Hospital, Philadelphia, PA   Department of Surgery |
| 2000-05 | Underwood Memorial Hospital Cancer Committee - Thoracic Surgery Representative |
| 2000-2002 | Trauma Surgeon - Beebe Medical Center, Lewes, DE |
| July 2002 | Member Advisory Committee on Continuing Medical Education New Jersey State Board of Medical Examiners |
| Nov 2004 | Performance Improvement Committee-Memorial Hospital of Salem County |
| 2006 | Senior Scholar-Department of Health Policy, Jefferson University |
| 2006-2007 | Underwood Memorial Hospital Cancer Committee – General Surgery Representative |

## SPECIALTY CERTIFICATION:

Human Subjects Research Compliance Program Certificate 10-26-05
American Board of Surgery-Board Certified Nov. 4, 1991 #36660
Recertified December 2001 Rank score 9th percentile in nation
ECFMG Certificate #342-002-3 Issue date: July 22, 981 Valid Indefinitely
Diplomat Federal Licensing Examination Board
Basic Cardiac Life Support
Advance Cardiac Life Support - Provider
Advance Trauma Life Support - Provider
Advance Trauma Life Support-Certified Instructor

## MEDICAL LICENSURE:

| | |
|---|---|
| Pennsylvania | MD039406-L  Issue date: July 1, 1983 Inactive status as of 1/1/2005 |
| Delaware | C1 0005653 Expires 3/31/09 |
| New Jersey | MA47034   Issue date: Sept. 30, 1985 Expires 6/30/09 |

## MEMBERSHIPS IN PROFESSIONAL & SCIENTIFIC SOCIETIES:

Delaware Valley Vascular Society
Association for Surgical Education
Diplomat American College of Surgeons - Associate Fellow
Medical Society of New Jersey-Legislative Council
Medical Society of Delaware-VP Sussex County Medical Society
Medical Society of Delaware – Board of Trustees & Public Laws
Medical Society of Delaware-Universal Health Care Task Force 6-12-07
New Jersey Board of Medical Examiners – CME Advisory Committee
American Society of Abdominal Surgeons
American Society of General Surgeons
RMS Disease Management Services – Quality Care Committee Member

268

3

A-136

CURRICULUM VITAE
Robert C. Villare, MD
Page 4

## ACADEMIC COMMITTEES

| | |
|---|---|
| 1987-89 | Residency Admissions Committee - Episcopal Hospital |
| 1988 & 1990 | Medical Education Committee |
| | Episcopal Hospital, Philadelphia, PA |

## MAJOR TEACHING AND CLINICAL RESPONSIBILITIES:

| | |
|---|---|
| 1987 - 1988 | Surgical Resident Conference and Teaching Rounds - |
| 1990 - 1991 | Episcopal Hospital |
| 1998 - 1999 | Surgical Resident Lectures and Teaching Rounds - |
| | Jefferson University Hospital-Methodist Division. |
| 2001- Present | Advanced Trauma Life Support Instructor |

## GUEST LECTURER

| | |
|---|---|
| January 1999 | "Deep Vein Thrombosis & Pulmonary Embolism" Family Medicine Residency-Underwood Memorial Hospital |
| October 1999 | Managed Care/HMO Provider Contracts and Professional Unions. West Jersey Medical Society-Guest Speaker |
| April 26, 2001 | ATLS Instructor "Shock Lecture" University of Medicine & Dentistry-Cooper Hospital. Camden, NJ |
| June 28, 2002 | ATLS Course Instructor. "Trauma in Women & Pregnancy" Christiana Hospital, Newark, DE |
| Sept 14, 2001 | ATLS Course Instructor. "Trauma in Women & Pregnancy" Christiana Hospital, Newark, DE |
| Sept 14-15, 2002 | ATLS Course Instructor. "Injury Due To Burns & Cold" Christiana Hospital, Newark, DE |
| May 29, 2003 | ATLS Instructor. "Injury in Burns & Cold" Christiana Hospital Newark, DE |
| June 14-15, 2004 | ATLS Instructor. "Thoracic Trauma" Thomas Jefferson University Hospital. Philadelphia, PA. |
| January 2005 | Malpractice & Reimbursement Reform- Guest Speaker Gloucester County & Salem County Medical Society. |
| Feb 14, 2005 | ATLS Instructor. "Shock Management" Christiana Hospital Newark, DE |
| Sept. 2006 | ATLS Instructor. "Trauma in Women" Christiana Hospital Newark, DE |

269

4

A-137

CURRICULUM VITAE
Robert C. Villare, MD
Page 5

## RESEARCH AND PUBLICATIONS:

| | |
|---|---|
| May 1989 | "Surgical Management of Severe Liver Trauma, A Role for Liver Transplantation", Journal of Trauma, Vol. 29, No.5 pg. 606-608. |
| August 1988 | "Liver Transplantation Following Severe Liver Trauma", Transplantation, Vol.46, No. 2, pg. 321-322. |
| | Abdominal Aortic Aneurysm associated with Ectopic Pelvic Kidney. Review and technical considerations. 14th Reported Case in World Literature. (Manuscript in Progress) |
| September 14, 1996 | Villare RC, Davies AL: Local / Regional Recurrence Following Video-Assisted Thoracoscopic Surgery for Primary Lung Tumors. Poster Presentation. |
| March 2005 | Delaware Health & Fitness-Today Media Publications Electronic Medical Information Highway-Medical Informatics [Published March 2005] |
| Present | Electronic Medical Records & Computerized Medical Management: Challenges and Potential Rewards-A Comprehensive Review [Manuscript in progress] |
| Present | Technology & Business Process Reengineering in Health Care [Manuscript in progress] |
| Present | Principal Investigator: Mobile Medical Records Institute Portable Mobile Medical Records System & Process Reengineering in Health Care [NIH Grant R03, R01 and PHS 398 application pending] |
| September 2005 | Co Investigator: Surgical Site Infections in Ambulatory Surgery At An Academic Institution. Developed and Published Study Protocol-Jefferson University Department of Health policy and Quality. [In Progress]. |

A-138

**CURRICULUM VITAE**
**Robert C. Villare, MD**
**Page 6**

## ABSTRACTS & PRESENTATIONS

September 14, 1996 Villare RC and Davies AL
Minimally Invasive Thoracic Surgery Interest Group - First
International Symposium.
Brigham & Women's Hospital-Harvard Medical School-Boston.
Video Assisted Thoracoscopic Surgery for Primary Lung Tumors.

April 8, 2000 Pennsylvania Hospital Vascular Symposium-
Controversies in Vascular Surgery. Renal Artery Disease-Renal
Artery Bypass vs Angioplasty

**Graduate Course Completion:**
1. Principles of Health Care Management-Rutgers University: Department of Health Policy and Administration
2. Health Care Financial Management- Rutgers University
2A. Malpractice Law-Audited, Rutgers Law School
3. Management Information Systems- Rutgers University
4. Organizational Behavior- Rutgers University
5. Role of Government in Health Policy-Johns Hopkins University: Bloomberg School of Public Health, Department of Health Policy and Management
6. Social and Policy Contexts of Health Care- Rutgers University
7. Patient Safety and Medical Errors- Johns Hopkins University
8. Research Methods-Rutgers University
9. Informatics in Public Health- Johns Hopkins University
10. GME Patient Safety Curriculum: Developing Faculty Leaders and Pioneers. National Center for Patient Safety
11. Human Resource Management-Rutgers University
12. Law & Public Policy-Rutgers University
13. Health Policy Special Project-Jefferson University Department of Health Policy & Quality. Chairman-David Nash, M.D., M.B.A.
14. Health Law-Widener Law School
15 Public Health Ethics-Johns Hopkins University
16. Directed Study-Integrating EMR/PM Systems; Implications for Medical Affairs, Health Policy and Hospital Operations. Future Directions.

271

A-139

6

## ATTACHMENT ONE COMMUNICATION WITH
### VIET NAM VETERANS OF AMERICA

| DATE | PERSON | METHOD OF COMMUNICATION | IDENTIFY COMMUNICATION |
|------|--------|------------------------|------------------------|
| 13 Mar 00 | Terry Baker | Personal visit to VVA Office | Requested representation by VVA Assistance in preparing claim |
| 13 Mar to 18 Dec 2000 | Terry Baker Gail Rando | Personal visits to VVA office | Checking on status of VA claim |
| 18 Dec 2000 | Terry Baker Gail Rando | Personal visit to VVA office | Prepared new form 21-526 and filed same. Claim stated seeking service connection for residuals of hernia. |
| 18 Dec 2000 to 27 Jun 2001 | Terry Baker Gail Rando | Vickie Snyder, daughter, telephone calls on behalf of her father | Check on status of claim, completing records check of all marriages & divorces Filling out consents to release |
| 27 Jun 2001 | Terry Baker Gail Rando | Vickie Snyder & David Jones (read to by daughter) | Document covering all marriages & divorces & death certificates of all dead spouses |
| 17 Sep 2001 | Gail Rando | Vickie Snyder | Forwarded new Form 21-526 Claim S/c disabilities for complications from operation received at VAMC Jan 2000 for hernia |
| 17 Sep 01 to 22 Mar 02 | Gail Rando | Vickie Snyder | Telephone calls to VVA re case status Filling requests for additional information |
| | | | 19 Apr 02        Gail Rando with ambulance run record |
| 19 Apr 02 to 21 May 03 | Gail Rando | Vicke Snyder | Telephone calls re case status. Answering requests for additional information additional consents to release medical records |
| 21 May 03 | Gail Rando | Vickie Snyder | Document restating essential information in support of claim. Additional statements in support of claim by Vicke Snyder, Helyn Jones & Archie Jones, III. |

No further contact

A-140



**DEPARTMENT OF VETERANS AFFAIRS**
Medical Center
1601 Kirkwood Highway
Wilmington, DE 19805-4989

December 22, 2005

In Reply Refer To: 460/00QM1

Thomas J. Reed
Professor of Law & Staff Attorney
Veterans Assistance Program
Widener University School of Law & Delaware Volunteer Legal Services, Inc.
4601 Concord Pike
P.O. Box 7474
Wilmington, DE 19803-0474

RE: David E. Jones, C 222 12 4185

Your letter requesting Quality Assurance documents related to the above case has been referred to my office for response.

Please be advised that the Veterans Health Administration follows directives under Title 38 United States Code (U.S.C.) Section 5705, and it's implementing regulations. Per this authority we can not release Quality Assurance documents relating to the above claim.

If you have any questions please call Romana Quesenberry, Risk Manager at (302) 633-5427.

MELINDA HAEBEL, RN
Quality Manager

DEC 2 1 2005

A-141                    187